31 So.3d 1012 (2010)
PROPERTY INSURANCE ASSOCIATION OF LOUISIANA
v.
Steve THERIOT, In his Official Capacity as the Legislative Auditor for the State of Louisiana.
No. 2009-CC-1152.
Supreme Court of Louisiana.
March 16, 2010.
*1013 Middleberg, Riddle & Gianna, Elliot Ross Buckley, Jr., New Orleans, Jennifer Rebekah Wardern, Sonia Mallett, New Orleans, Alvin John Herbert, III, for Applicant.
James D. Caldwell, Attorney General, Angelique Duhon Freel, Uma Maheswari Subramanian, Assistant Attorneys General, Jenifer Schaye, for Respondent.
James D. Caldwell, Attorney, Angelique Duhon Freel, Uma Maheswari Subramanian, Assistant Attorneys General, Jenifer Schaye, Baton Rouge, for Respondent.
CLARK, Justice.[1]
We granted this writ application in order to determine whether the courts below erred, first, in denying the motion for summary judgment filed by Property Insurance Association of Louisiana, and, then, in granting the motion for summary judgment filed by the Legislative Auditor for the State of Louisiana and finding that Property Insurance Association of Louisiana is a public entity. For the reasons which follow, we reverse the ruling of the court of appeal, render summary judgment in favor of Property Insurance Association of Louisiana, and find that Property Insurance Association of Louisiana is a private association.

FACTS and PROCEDURAL HISTORY
Property Insurance Association of Louisiana ("PIAL") is an industry trade group and the primary rating organization for fire insurance in the state. In 2001, PIAL entered into a contract to manage and conduct the business of the Louisiana Auto Insurance Plan ("LAIP"), the state's auto insurer of last resort. Likewise, in 2003, PIAL contracted with Louisiana Citizens *1014 Property Insurance Corporation ("Citizens"), the state's property insurer of last resort, for Citizens' operation and administration.
In 2007, Steve Theriot, then the Legislative Auditor for the State of Louisiana ("LLA"), began a compliance audit of Citizens, LAIP, and PIAL for calendar years 2004, 2005, and 2006. In connection with its audit, LLA issued an Information Report dated September 12, 2007. In the Report, LLA delivered its opinion that PIAL was a public entity which was subject to the Ethics Code, Civil Service Laws, Open Meetings Laws, Audit Laws, Public Bid Law, Professional Services Procurement Law, and Procurement Code.
On September 28, 2007, PIAL filed a petition for declaratory judgment in the Nineteenth Judicial District Court, naming LLA as defendant. In its petition, PIAL prayed for a judgment declaring that PIAL is a private association and not a public agency. LLA answered the suit, denying that PIAL was a private association and asking for a judgment declaring PIAL a public entity under the laws of the state. Shortly thereafter, LLA filed a motion for summary judgment, again asking the court to render a judgment declaring that PIAL is a public entity under Louisiana law. PIAL responded with its own motion for summary judgment, praying that the court declare PIAL a private association.
After hearing the competing motions for summary judgment, the trial court denied both motions. Both parties appealed. After denying PIAL's writ, the court of appeal granted LLA's writ, reversed the trial court's denial of LLA's motion for summary judgment, rendered judgment granting LLA's motion for summary judgment, and declared that PIAL is a public entity for all purposes.[2]
This Court granted writs in order to examine the propriety of that decision.[3]

DISCUSSION
We apply a de novo standard of review in considering the lower courts' rulings on the parties' summary judgment motions. Suire v. Lafayette City-Parish Consolidated Government, XXXX-XXXX, p. 11 (La.4/12/05), 907 So.2d 37, 48. Summary judgment should be granted when
the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966(B). A genuine issue exists where reasonable persons, after considering the evidence, could disagree. In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony or weigh evidence. A fact is "material" if it is one that would matter at trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of trial on the merits.
Suire, 907 So.2d at 48.
The question raised in both motions for summary judgment is whether PIAL is a public or private entity. As argued by the parties and as discussed by the court of appeal, this Court has specified four factors which determine an entity's public or private character. These factors are (1) whether the entity was created *1015 by the legislature, (2) whether its powers were specifically defined by the legislature, (3) whether the property of the entity belongs to the public, and (4) whether the entity's functions are exclusively of a public character and performed solely for the public benefit. State v. Smith, 357 So.2d 505 (La.1978). In Smith, while not stating explicitly that all four factors must be met in order to find that an entity was public, we did so by implication.[4] Today, we hold that all four factors must be present in order for a court to determine that an entity is public. Accordingly, we address each factor.

Was PIAL created by the legislature?
PIAL contends that the organization's predecessor was chartered in 1888 by private fire insurance companies as a private association, and that the legislature on several occasions has only authorized its existence. LLA, however, argues that the legislature created PIAL's predecessor in Act 302 of 1926, which mandated that the fire insurance companies organize a fire prevention bureau, and, in the same act, dissolved any previously organized bureaus.
A review of the history of Louisiana's fire prevention bureaus shows that in 1888, fire insurance companies in the state formed by charter the Property Holders Mutual Aid Fire Indemnity Society, which PIAL claims as its predecessor. The legislature, in Act 110 of 1900, implicitly recognized the association's existence, and made it unlawful for fire insurance companies, associations, or partnerships to organize for the purpose of governing, controlling, or influencing insurance rates. In 1902, Act 183 made it lawful for fire insurance companies to organize a Fire Prevention Bureau to make inspections as to physical care and condition of risks, to define the safest methods of construction, and to supervise the installation of devices involving fire hazards, all in order to reduce the chance of fire.
Act 189 of 1904 again authorized fire insurance companies to organize a Fire Prevention Bureau to make inspections as to physical care and condition of risks, to define the safest methods of construction, to supervise the installation of devices involving fire hazards, and to collect statistical information in order to reduce the chance of fire. In 1912, the legislature, through Act 224, again declared that it was unlawful for fire insurance companies, associations, or partnerships to organize for the purpose of governing, controlling, or influencing insurance rates.
The legislature "created" the Insurance Commission by means of Act 302 of 1926. The act also ordered fire insurance companies to "organize" the Louisiana Rating and Fire Prevention Bureau under the supervision of the Insurance Commission. As contemplated by the Act, the Rating and Fire Prevention Bureau was to be *1016 organized by the fire insurance companies, to make rates with the approval of the Insurance Commission, to make inspections as to physical care and condition of risks, to define the safest methods of construction, and to supervise the installation of devices involving fire hazards, all in order to reduce the chance of fire. Act 302 also dissolved the fire prevention bureau organized under Act 189 of 1904 and authorized the Insurance Commission to audit the new Bureau's books.
In Act 125 of 1958, the legislature amended and re-enacted the first and second chapters of the Insurance Code. The Act continued the Louisiana Rating and Fire Prevention Bureau, which was to inspect every risk specifically rated by schedule and make written surveys of such risks, to define the safest methods of construction, to supervise the installation of devices involving fire hazards in order to reduce the chance of fire, and to make rates with approval of the Insurance Commission. The Act also allowed for corporations, unincorporated associations, partnerships and individuals to apply to the Insurance Commission for licensing as "other rating organizations." The Act continued to authorize the audit of the Louisiana Rating and Fire Prevention Bureau by the Insurance Commission.
Act 311 of 1975 changed the name of the Louisiana Rating and Fire Prevention Bureau to the Property Insurance Association of Louisiana. In 1999, Act 885 transferred the Board of Directors of PIAL to the Department of Insurance. Finally, in 2007, Act 420 authorized LLA to audit PIAL, and Act 459 changed the makeup of PIAL's Board of Directors.
That the legislature has concerned itself with fire prevention, fire safety, and fire insurance rate making is clearwhat is less clear is whether the legislature itself created the fire prevention bureau or, instead, arranged for its creation by another body. Assuming that LLA is correct that PIAL's predecessor was formed in 1926 rather than in 1888, we look to the wording of Act 302 of 1926.
Act 302 reads, in pertinent part:
AN ACT
To establish uniform rates for fire, windstorm and hail, and automobile fire and theft insurance in Louisiana, and to prohibit discrimination in insurance rates; to provide for the organization of a "Rating and Fire Prevention Bureau"; to create an Insurance Commission, fix its powers and prescribe its duties; to provide penalties for the violation of this Act; to repeal Act 189 of 1904, and all laws in conflict.
Qualifications, Number, Powers and Salary of Commissioners.
Section 1. Be it enacted by the Legislature of Louisiana, That there is hereby created a Board to be known as the Insurance Commission ...
Louisiana Rating and Fire Prevention Bureau.
Section 2. Under the supervision of the Insurance Commission the Stock fire insurance companies licensed to do business in this State shall organize a Bureau to be styled "The Louisiana Rating and Fire Prevention Bureau" ...
1926 La. Acts, No. 302, p. 571, 571-72.
The rules of statutory interpretation mandate that this Court consider the legislature's choice of language as deliberate. Miller v. LAMMICO, XXXX-XXXX, p. 15 (La.1/16/08), 973 So.2d 693, 703-4, citing Hall v. Brookshire Brothers, Ltd., 2002-2404, p. 19 (La.6/27/2003), 848 So.2d 559, 571. In the Act, the legislature "created" the Insurance Commission in Section 1, but then in the following section, ordered the "fire insurance companies" to "organize" *1017 the Louisiana Rating and Fire Prevention Bureau. Had the legislature intended to "create" the Louisiana Rating and Fire Prevention Bureau, it could have done so, just as it "created" the Insurance Commission in the same act.
An example of the legislative creation of an entity may be found in La. R.S. 22:2056,[5] by which the legislature created the Louisiana Insurance Guaranty Association. The statute reads in pertinent part:
§ 2056. Creation of the association
A. There is created a private nonprofit unincorporated legal entity to be known as the "Insurance Guaranty Association", [sic] whose domicile for purpose of suit shall be East Baton Rouge Parish, Louisiana. All insurers defined as member insurers in R.S. 22:2055 shall be and remain members of the association as a condition of their authority to transact insurance in this state. The association shall perform its functions under a plan of operation established and approved under R.S. 22:2059 and shall exercise its powers through a board of directors established under R.S. 22:2057.
La. R.S. 22:2056(A).
We hold that the legislature did not create the Property Insurance Association of Louisiana.

Are PIAL's powers specifically defined by the legislature?
LLA argues that PIAL's powers were specifically defined by the legislature in Act 302 of 1926, and that PIAL's powers are now defined in La. R.S. 22:1460.[6] PIAL contends that these specified powers are not exclusive, and that it possesses other powers derived from its corporate governance documents or through its board of directors, such as providing services to insurance companies, hiring and firing employees, and entering into contracts.
La. R.S. 22:1460 reads in pertinent part:
* * *
D. The powers and duties of the association shall be:
(1) To inspect or cause to be inspected every risk specifically rated by schedule for property damage insurance and to make a written survey of such risk, which shall be filed as a permanent record in the main office of the association. Present inspections and surveys may be used in lieu of new inspections and surveys. Such survey or schedule shall give in detail the defects either of construction or of occupancy, or both, existing in the risk which effect the property damage rate. The rate at which the risk must be written by the members of the association shall be stated in the survey together with the relative measure which each defect bears to the fire hazard as a whole and to the basic cost of the same and the consequent proportionate value of each improvement suggested to minimize the chances of fire so that each assured may be informed as to the manner in which his rate was determined and the measures which should be taken to effect a reduction in the rate and the sum of each reduction. The records of the association shall be exempt from the application of R.S. 44:1 et seq., except that a copy of such survey shall be furnished, upon request, to the owner of every risk, or to any member company or resident agent, provided *1018 said company has a policy in effect on the risk, without expense to said owner.
(2) To make rates on fire and extended coverage insurance as defined in Paragraphs (10) and (11b) of R.S. 22:47 and on such other coverages as are usually written by fire insurers on property other than motor vehicle insurance located in this state, in accordance with the provisions of this Subpart. Provided, however, that by and with the approval of the commissioner of insurance, other rating organizations created for the purpose of making and promulgating rates for special or particular kinds or classes of business written by fire insurance companies may be licensed under the terms or conditions of this Subpart.
(3) To audit, on special call by the association, policies written by member companies in compliance with filings as approved or made in accordance with the provisions of this Subpart.
(4) To survey municipal areas for publication of public fire protection grading.
(5) To file fire insurance rating schedules with the commissioner of insurance.
(6) To review building plans and specifications and fire suppression system plans and specifications when submitted to it for review, and to offer nonbinding recommendations for upgrading the fire insurance rating.
(7) To review fire suppression system plans, when submitted to it, and to offer nonbinding recommendations to upgrade fire protection gradings of municipal areas.
(8) To promulgate average rates.
(9) To design and file policy forms with the department.
(10) To perform such functions, to engage in such activities, to employ personnel, consultants, and counsel, and to acquire equipment and facilities adequate to exercise the powers and duties authorized by law in order to encourage and promote programs, legislation, and regulations calculated to produce and maintain a healthy and competitive property insurance market in Louisiana for the benefit of the insuring public.
(11) To consider the addendum and other recommendations of the advisory committee of the board of directors of the Property Insurance Association of Louisiana in accordance with Subsection M of this Section and to make public the current addendum as approved by the board of directors of the Property Insurance Association of Louisiana.
The gist of PIAL's argument is that while the legislature did, indeed, specifically define PIAL's powers, it did not specify all of PIAL's powers, and, thus, this factor would weigh in PIAL's favor. The legislature, though, is not required to specify all, or even most, of an entity's powers in order for that entity to be found a public body. To find otherwise would be to accord an entity the power to establish its private nature by granting itself just one power which the legislature did not address. We hold, therefore, that the legislature did specifically define PIAL's powers.

Does PIAL's property belong to the public?
La. R.S. 22:1460(E) mandates that all fire insurance companies licensed to operate in Louisiana must belong to PIAL and pay levies to PIAL "equitably in proportion to the services rendered by the association to the individual member." Further, for a period of time ending in 2008, PIAL contractually provided administrative services to Citizens, which receives public funding, on a cost-reimbursement basis. LLA argues that because PIAL's source of revenue is guaranteed by state law *1019 through mandatory assessments on its members, and because PIAL received public money through its contractual relationships with Citizens and LAIP, PIAL's property belongs to the public.
PIAL disagrees, contending that it does not receive any public funding. PIAL asserts that the member assessments are private money paid by private companies to a private association, and that this private money does not become public money simply because the assessments are guaranteed by state law. PIAL further argues that being paid for services by contract with public funds does not make a contracting party public. We agree.
By statute, PIAL's "expenses ... shall be paid by its members and subscribers through assessments levied upon them by the association ... [and] [t]he association shall have the right to charge subscribers for services rendered, and to charge members and subscribers reasonable entrance and annual membership and subscription fees." R.S. 22:1460(E)(1). These assessments, charges, and fees are paid by private parties directly to PIAL. The funds are not paid to or from the state general fund, and any excess funds would be returned to the members/subscribers and not paid into the general fund.
In addition, PIAL was reimbursed by Citizens for expenses incurred by PIAL in its contractual administration of Citizens.[7] According to LLA, 58% of PIAL's revenue flowed through this contract. R. at 49. In Smith, this Court stated that the presence of public funds flowing through a private nonprofit corporation by contract was not enough to transform the corporation into a public entity. Smith, 357 So.2d at 508. This concept was reiterated in Bankston, 715 So.2d at 1185, where we, again, used the four factors to determine that a corporation was a private entity.
LLA argues that several cases have held that property is public under less compelling circumstances: Louisiana Public Fac. Auth. v. Foster, XXXX-XXXX (La.9/18/01), 795 So.2d 288; Spain v. Louisiana High School Athl. Assn., 398 So.2d 1386 (La. 1981); and Louisiana Ins. Guaranty Assn. v. Comm. on Ethics for Public Employees, 95-0021 (La.App. 1 Cir. 5/5/95), 656 So.2d 670.
In Louisiana Public Fac. Auth. (LPFA), this Court held that the Public Facilities Authority ("PFA"), a non-profit public trust and public corporation, was a public entity rather than a private citizen, and, therefore, was not protected by the state constitution and laws respecting impairment of obligations of contract. The Court did not explicitly examine the Smith factors (or even mention their existence), but did discuss the issues contained in the factors in a general way. In our discussion regarding property and funding, we said explicitly that the state did not provide funding, as PFA's funding was primarily derived from application and closing fees from the issuance of bonds and from investments. LPFA, 795 So.2d at 294. In addition, we stated that PFA issued special obligation bonds for eligible public and private projects throughout the state, that in most instances the bonds were exempt from income taxes, and that, generally, the bonds were not debts of the state. LPFA, 795 So.2d at 294, n. 9. Further, the beneficial interest in the trust was owned by the state and the other public bodies designated as beneficiaries and the original funding of the trust came from wills or written trust documents naming the state and/or other public bodies as *1020 beneficiaries. LPFA, 795 So.2d at 294. Despite the fact that we stated that the PFA received no public funding, we ruled that because the legislature had created the PFA and subjected it to state laws regarding public records, open meetings, public bids, bond validation procedures, ethics, and legislative audit, the legislature intended to regulate its own creation. Here, though, the legislature did not create PIAL, and the legislature has exempted PIAL from the public records law.
In Spain, a news director sought an injunction to keep the Louisiana High School Athletic Association ("LHSAA") from holding closed meetings. We found that the LHSAA was a public body under the definition contained in the Open Meetings Law:
`Public body' means village, town, and city governing authorities; parish governing authorities; school boards, and boards of levee and port commissioners; boards of publicly operated utilities; planning, zoning, and airport commissions; and any other state, parish, municipal, or special district boards, commissions, or authorities, and those of any political subdivision thereof, where such body possesses policy making, advisory, or administrative functions, including any committee or subcommittee of any of these bodies enumerated in this Paragraph. `Public body' shall not include the legislature. R.S. 42:4.2(A)(2).
Spain, 398 So.2d at 1387. In noting that the LHSAA had cited "a plethora of cases" in which it had been held to be a private, voluntary association, we stated:
It is important to note, however, that this body of law did not deal with a positive legislative pronouncement which defined the conditions under which an entity must be deemed `public' for a limited purpose.
Spain, 398 So.2d at 1390-1. There is no such positive legislative announcement in this matter today.
In Spain, again, as in LPFA, we did not mention Smith or the factors it established, as we were solely concerned with whether the LHSAA was a public body as defined by statute. We did, however, discuss the LHSAA's financing, although, again, funding was not a basis for our decision. The money for financing the LHSAA was derived from membership dues (80% of the membership was public schools and 20% private schools), a percentage of gate receipts from sporting events, and entry fees for participation in sports for championship honors. Spain, 398 So.2d at 1388. By rule, fees were required to be paid with school check (but the commissioner testified that they would "take any check that was good"). Spain, 398 So.2d at 1388-89. Furthermore, the staff of the LHSAA were defined as teachers and were included in the Teachers' Retirement System of Louisiana. Spain, 398 So.2d at 1389.
Because the LHSAA performed a major policymaking, advisory and administrative function in an area within the primary control of public bodies listed in the Open Meetings Law, we held that the LHSAA, and its committees and subcommittees, constituted collective committees or subcommittees of the parish school boards or State Board of Elementary and Secondary Education, and was thus a `public body' for the purposes of the Open Meetings Law. Spain, 398 So.2d at 1390.
Finally, in Louisiana Ins. Guaranty Assn. (LIGA), the court of appeal held that the Louisiana Insurance Guaranty Association was a public entity under the Code of Governmental Ethics. The court of appeal did discuss and apply the four Smith factors. With regard to the categorizing *1021 of LIGA's property, the court of appeal said:
LIGA obtains its funds from member insurers pursuant to assessments under [statute]. However, these assessments, which are evidenced by a certificate of contribution, are offset against the member insurer's premium tax liability, not to exceed a total offset of 100%. Moreover, any sums acquired by refund under [the statute] from the association, which were written off by the insurer and offset against premium taxes, but which are not needed to effectuate the purposes of the Louisiana Insurance Guaranty Act, are required to be paid by LIGA to the Commissioner of Insurance and deposited with the state treasury for credit to the general fund of the state.
LIGA, 656 So.2d at 675. By use of the word "however" at the beginning of the second sentence of the quote, the court of appeal recognized the difference between obtaining funds from member insurers which are not subject to tax offsets or returnable to the state general fund, as does PIAL, and those which are so subject.
Because assessments levied on private insurance companies do not become public money simply because the assessments are guaranteed by state law, and because the receipt of public funds in payment of contractual fees for services does not make a contracting party public, we hold that PIAL's property does not belong to the public.

Are PIAL's functions exclusively of a public character and performed solely for public benefit?
LLA argues that PIAL's functions are not only public, but also regulatory, in that PIAL serves as a rate-making body and promulgates rules and regulations. LLA also points out that R.S. 22:1452[8] emphasizes the public interest in "promot[ing] the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate, or unfairly discriminatory ...," and that R.S. 22:1460(D)(10) states that the purpose of PIAL's duties is "to encourage and promote programs, legislation, and regulations calculated to produce and maintain a healthy and competitive property insurance market in Louisiana for the benefit of the insuring public." LLA argues that because PIAL carries out its duties solely for the benefit of the insuring public, PIAL satisfies the fourth Smith criterion.
PIAL, conversely, argues that it performs its functions for the exclusive benefit of its members, rather than the public, but acknowledges that the public does receive a derivative benefit from its performance of those functions.
La. R.S. 22:1452(A), the section partially quoted by LLA as support for its argument, reads in its entirety:
The purpose of this Subpart is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate, or unfairly discriminatory and to authorize and regulate cooperative action among insurers in ratemaking and in other matters within the scope of this Subpart. (Emphasis added).
The means by which "cooperative action" is taken by insurers in ratemaking is through PIAL. PIAL represents the best interests of its members in recommending proposed rate increases to the Insurance Commission.
*1022 PIAL, in arguing that it performs its functions for the exclusive benefit of its members, overstates its case. Although many of its functions only offer a derivative benefit, some of its mandated functions do directly benefit the public, such as reviewing fire suppression system plans. Because at least some of PIAL's functions are performed for the benefit of its member insurance companies, and thus their private stockholders, PIAL's functions are not exclusively of a public character and performed solely for public benefit.
Because Property Insurance Association of Louisiana does not meet all four of the criteria which define a public entity, as established in State v. Smith, we find that Property Insurance Association of Louisiana is not a public entity for all purposes.

DECREE
For the foregoing reasons, we reverse the rulings of the courts below to the extent that the motion for summary judgment of Steve J. Theriot, in his capacity as the Legislative Auditor for the State of Louisiana, was granted and the motion for summary judgment of Property Insurance Association of Louisiana was denied, and render judgment granting summary judgment in favor of Property Insurance Association of Louisiana.
REVERSED AND RENDERED.
NOTES
[1] Kimball, C.J., did not participate in the deliberation of this opinion.
[2] Property Ins. Ass. of Louisiana v. Theriot, XXXX-XXXX (La.App. 1 Cir. 4/3/2009) (unpublished).
[3] Property Ins. Ass. of Louisiana v. Theriot, XXXX-XXXX (La. 10/16/09), 19 So.3d 465.
[4] The Court, after first laying out the factors to be considered, analyzed only one-whether the entity had been created by the legislature. After determining that it had not been so created, the court found that the entity was not a public agency. This implication is bolstered by the fact that all post-Smith opinions which have examined the Smith factors either found the entity to be private after examining only one factor or required all four to be present in finding that the entity was public. See Bankston v. Board of Ethics for Elected Officials, 98-0189 (La.6/22/98), 715 So.2d 1181 (community action program not public entity because not created by legislature); State v. Duque, 42,074 (La.App. 2 Cir. 1/18/07), 946 So.2d 760 (community action agency not public entity because not created by legislature); Louisiana Ins. Guaranty Assn. v. Comm. on Ethics for Public Employees, 95-0021 (La.App. 1 Cir. 5/5/95), 656 So.2d 670 (public entity because all four factors present).
[5] La. R.S 22:2056 was renumbered from La. R.S. 22:1380 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009.
[6] La. R.S. 22:1460 was renumbered from La. R.S. 22:1405 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009.
[7] Whether or not Citizens is a public entity is an issue that is not before the Court, but for the purpose of this opinion only, we assume that it is.
[8] La. R.S. 22:1452 was renumbered from La. R.S. 22:1402 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009.